No. 16,298.

## CORYELL *v.* THE STATE.

**PRACTICE.**—*Reversing Case on the Evidence.*—If the evidence tends to support the verdict, the Supreme Court will not reverse the case, no matter how contradictory it may be when considered as a whole.

**CRIMINAL LAW.**—*Insufficiency of Evidence.*—*Case in Point.*—Insufficiency of evidence to sustain a conviction of manslaughter considered.

From the Jackson Circuit Court.

*B. H. Burrell, F. L. Branaman* and *J. M. Lewis,* for appellant.

*W. T. Branaman,* Prosecuting Attorney, and *A. G. Smith,* Attorney General, for the State.

MILLER, J.—The only question here is upon the sufficiency of the evidence to support the verdict. The appellant was indicted for the murder of Arthur E. Beadle. A trial by jury resulted in a verdict of manslaughter, fixing his punishment at ten years' imprisonment.

The appellant admitted the killing, but claimed that it was done in self-defence.

The evidence shows without dispute that the appellant and his wife, Cora, had been separated something over a year. The wife had possession of their child, an infant of less than two years of age, until about eight weeks prior to the tragedy, when the appellant took and kept it. On the night of the homicide the appellant took his child and his mother to a school-house, where religious services were being held. His wife, Cora, and her father, Luther Beadle, her brothers, Victor Beadle, and the deceased, Arthur E. Beadle, and other members of the family, were attendants at the services. The appellant sat with his child in the back part of the house, near the door. After the close of the services his wife went back to him and took hold of the child, when a scuffle ensued for its possession, in which he slapped or pushed his wife. A fight then ensued between the appellant and the three Bead-

les, the father and two sons, during which one of them, a boy sixteen years old, was shot and killed.

The evidence for the prosecution as to the circumstances of the killing is in substance detailed in the following synopsis, copied, largely, from the brief of the attorney general:

Eva Donalds, the first witness for the State, testifies that after church the appellant's wife went up to him, and asked to see the baby. He told her to let it alone. She replied that she had as much right to see it as he had, and took hold of it, whereupon he struck her and called her a vulgar name. The deceased then came up and struck him, after which the crowd gathered and the witness saw no more. She saw them have appellant down on the floor, and deceased striking him. They were fighting from the time they commenced until the shot was fired. The baby was back where they were fighting, and the wife got it, and the witness helped her take it out through the window.

On cross-examination this witness testifies that when appellant's wife took hold of the baby's hand he struck her, and she said she had as much right to have the baby as he had, and she wanted it. He said he would not do it, and for her to let go of the baby; she did not do so, and he struck her a second time, but she still held on to the baby. The deceased then came up, and defendant said nothing to him, nor he to deceased. Then defendant jerked the baby away from his wife, and whirled around in the aisle, and started for the door, and the deceased and Luther Beadle (the father) followed him. The door was shut, and he then went into the corner, holding on to the baby. The defendant struck the deceased, and the deceased and his father struck the defendant. The baby was put on the desk, and the men were fighting. Witness saw the deceased hit the defendant one or two times just before she went out of the window. He was down on the floor, and the other men were on him.

Zachariah Marling testified that after church was dismissed the defendant had his baby in his arms; that just after

church closed he saw Luther Beadle make a motion to defendant's wife, and whisper to her, and she started down the aisle to defendant, her father following her. Witness heard swearing, and a noise like some one was struck or kicked. The three Beadles were in front of the defendant, and they were fighting. They were crowded over in the southeast corner. Saw a revolver raised, as if some one was striking with it. The three Beadles were striking the defendant, but the witness could not see just what part the deceased was doing. The defendant struck deceased with a revolver, and deceased had defendant by the collar, and was hitting him. The three Beadles had defendant down on the floor, when the defendant put his revolver under his arm and fired. Deceased struck defendant once or twice after the shot was fired, and then went out followed by his father. The defendant followed to the door, where his revolver was taken away from him ; that at the time the shot was fired the Beadles had the defendant down, the deceased was striking him, and Victor Beadle was upon him and striking him.

Jacob Myers testified that he heard the shot, and afterwards took the revolver away from the defendant, who said to him, " I will shoot the damn heart out of you if you don't let me go. They are all on me."

On cross-examination he says : " I was near the door when I heard the shot. I saw that it was the three Beadles and defendant that were fighting in the corner. They had defendant down on the floor.

James G. Allison testified that either in August or October the defendant said to him that he would " wipe out " three of the Beadles.

Isaac N. Collins testified to a threat made by the defendant, on Christmas eve, that he would put daylight through some of the Beadles if they were not careful.

Mattie Powell's evidence was to the effect that, after the close of the services, the defendant was putting on the child's wraps, when his wife came up and grabbed the child. He

told her to let go of the child.   She said she would not, and held on, and he slapped her.   Then the three Beadles came up and commenced to fight the defendant, who took up the baby in his arms, and started for the door, and asked some one to open it.   The door was opened by some one, and then closed.   When he started for the door some one jerked him back, and they crowded him over in the corner, and were all fighting the defendant there, and had him down on the floor when the shot was fired.   This witness also says that the defendant started to run out of the house, when the door was closed ; that he started fast.

Eliza Beadle testified that she saw the defendant's wife go to him, and said, " Samuel, let me see the baby," to which he replied, " No," when she took hold of the baby, whereupon he slapped her.   This witness did not see much of the fight, but says the Beadles were all after him, and when they got back into the corner the wife followed them up.

William L. Ross says that he first knew of the trouble when he heard a woman scream.   He then got upon a seat and saw the defendant and the three Beadles in the corner of the room.   Defendant set the child down on a corner and commenced to knock the deceased.  Deceased and his brother were knocking the defendant.   They had knocked him againt the wall, and then Luther Beadles, the father, ran in and struck defendant ; that at the time of the shot they were in the corner, the defendant on his knees and the others about him.   The deceased was sixteen years old, tall and slender, and would weigh one hundred and ten pounds.

William W. Collins testified that he caught the defendant and held him while Myers took the revolver from him. Myers told defendant that he had killed one man and not to kill another, to which defendant replied, " Let me go ; " also, that the defendant struck at Sarah Beadle.

On cross-examination this witness says that he heard the defendant call for help, but that no one went to his rescue.

Luther Beadle, father of the deceased, testified that after

the defendant came in with the baby, witness went to Cora and spoke to her, and that after church he made a sign to Cora, and she went to defendant and reached out her hand for the child, but defendant would not give her the child; that she grabbed it and he slapped her, and she held on to the child. He tried to get her loose from the child but could not, then he struck her two or three times, but she held to the child; that the deceased started from the other side of the room, and when he got close to the defendant he commenced pushing him back. " I and my eldest son went there. I saw defendant had a revolver. He presented it at my breast, and he tried the second time. I knocked it off. He then put the revolver under the deceased's clothes and shot. I was then with my two boys. When I left the stove to go to the defendant they were in the northeast corner of the room, about eight feet from were the defendant struck his wife. When I got to them the deceased had the defendant by the hair of the head and was pushing him against the wall. The baby was on the floor. Victor and I started for the defendant about the same time, and got there about the same time. There was quite a scuffle in the corner. When Arthur (the deceased) and defendant were fighting, Victor handed him one. I knocked him nearly down during the fight. He shot, and Arthur quit fighting, saying, " I am killed," and went out. I started to follow him, and defendant snapped his revolver at me. I struck him and staggered him back.

On cross-examination the witness says that he had a revolver that night, which was taken from him by Jacob Meyers.

Victor Beadle testifies that when the wife went to the defendant he hit her. Then deceased went up, put his hand on defendant and pushed him back, whereupon the defendant struck him. Saw defendant strike deceased once. They got into the southeast corner of the room, twelve or fourteen feet from where it commenced. When the shot was fired

defendant was half bent over, and deceased had his head un-
der his arm and was pounding him.

Sarah Beadle, mother of the deceased, testified that after
church her daughter went to the defendant and asked to see
the child. He slapped her. She took hold of the child and
held on, and he hit her with his fist. His mother also hit
her. The deceased went up and pushed defendant back, and
defendant turned and hit him three times before he did any-
thing. When defendant got out he ran down into the corner
of the school-house. Cora took the child. Just before the
shot was fired, Luther knocked the defendant down, and the
deceased caught him by the back of the neck with one hand
and was thumping him with the other.

Bertha Collins says that when the defendant's wife went to
get the baby he slapped her, and commenced to run backwards
with the baby. Witness ran out of the house, and when she
came back she saw the defendant strike Luther Beadle with
a revolver.

Cora Coryell, wife of the defendant, says : " I went to de-
fendant and asked him to see the baby. He hit me with
his open hand. He hit me three times before brother came
up, and then Arthur struck him and the fight commenced.
He pulled off my fascinator in the racket. I got the child
from under them on the floor, in the northeast corner of the
house, where they were fighting. When I got the child, de-
fendant was bent over and my brothers were hitting him. I
was about the middle window of the house when the shot
was fired."

On cross-examination she says that the defendant tried to
get out of the house, but could not. She also says : " I
went to get the child and stayed until I got the child. Yes,
I got it."

On re-examination she testified that during the fight in
the corner of the room, the defendant asked one Robertson
to take the child while he killed the whole damn set.

We have thus epitomized the evidence adduced by the

State without reference to the exculpatory testimony introduced by the defendant. If the evidence introduced for the prosecution tends to support the verdict, it will be sufficient to sustain the conviction, no matter how contradictory the evidence may be, when considered as a whole.

The defendant is, however, entitled to the benefit of the uncontradicted testimony of his neighbors that his character in the neighborhood in which he resided was, and always had been, that of a peaceable, quiet and law-abiding citizen.

In our opinion, this evidence does not, even when viewed in the light least favorable to the defendant, sustain the verdict of the jury.

The action of the defendant in having upon his person a deadly weapon, carried in violation of law, and also his conduct in slapping or pushing his wife, particularly if she only asked to see their child, was most reprehensible, and at the outset placed the defendant in a position unfavorable to the maintenance of his defence.

·The evidence, however, shows that he subsequently made an effort to withdraw himself from the conflict, and that from that time he acted on the defensive.

The evidence for the State shows that after his unsuccessful effort to leave the school-house, he was forced to abandon the possession of his child ; was forced back into the corner of the room, and so set upon and assailed by the deceased and his father and brother that further retreat was impossible; that he was knocked or forced down on the floor and his cries for help unheeded ; that after an unsuccessful effort to free himself from his assailants by using his pistol as a club, he fired the fatal shot, when down, with three men beating him.

While the jury were not compelled to, we think they might have inferred, from this evidence, that there was a preconceived attempt on the part of his wife and her father and brothers to take the child from the possession of the defend-

ant, and that his wife did not simply ask to see the child, but demanded its possession, and took hold of it, and that the pushing or slapping was intended to free her hold without hurting the child. If such was the case, his conduct was much less reprehensible, for in order to keep from seriously injuring it, he was compelled to either surrender its possession or cause her by force to loosen her hold.

No questions of law are argued or involved, and a further discussion would be useless.

Judgment reversed, with instructions to grant the defendant a new trial.

Filed Dec. 12, 1891.